AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT

for the

Southern District of California

In the Matter of the Search of )
*(Briefly describe the property to be searched* )
*or identify the person by name and address)* )  Case No. **24MJ1063**
Facebook account "Cameron Fulston" with Facebook ID )
100093816679362 and URL facebook.com/profile.php? )
id=100093816679362 )

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A-1, incorporated herein.

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B, incorporated herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

❏ contraband, fruits of crime, or other items illegally possessed;

❏ property designed for use, intended for use, or used in committing a crime;

❏ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841(a)(1) | Possession with Intent to Distribute Controlled Substance, Distribution |
| 21 USC 846 | Conspiracy to Distribute Controlled Substance |

The application is based on these facts:

See Attached Affidavit

❏ Continued on the attached sheet.

❏ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

**Daniel Daugerdas** Digitally signed by Daniel Daugerdas
Date: 2024.03.13 12:26:57 -07'00'

*Applicant's signature*

DEA TFO Daniel Daugerdas

*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by

_____ *(specify reliable electronic means)*.

Date: 03/13/2024.

*Judge's signature*

City and state: San Diego, CA

Hon. Bernard G. Skomal, U.S. Magistrate Judge

*Printed name and title*

## **Attachment A-1**

### *Items to be Searched*

This warrant applies to information associated with the Facebook account "Cameron Fulston" with Facebook account ID 100093816679362 and URL facebook.com/profile.php?id=100093816679362 ("**Target Account 1**") that is stored at premises owned, maintained, controlled, or operated by Meta Platforms, Inc., a company headquartered in Menlo Park, California.

## Attachment B

### *Particular Things to be Seized*

**I.      Information to be disclosed by Meta Platforms, Inc. ("Meta")**

To the extent that the information described in Attachments A1-A2 is within the possession, custody, or control of Meta, regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Meta, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Meta is required to disclose the following information to the government for each user ID listed in Attachments A1-A2:

(a)      All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

(b)      All activity logs for the account and all other documents showing the user's posts and other Facebook activities from July 4, 2023, through November 16, 2023;

(c)      All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them from July 4, 2023, through November 16, 2023, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)      All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers;

groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)  All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)  All other records and contents of communications and messages made or received by the user from July 4, 2023, to November 16, 2023, including all Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)  All "check ins" and other location information;

(h)  All IP logs, including all records of the IP addresses that logged into the account;

(i)  All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)  All information about the Facebook pages that the account is or was a "fan" of;

(k)  All past and present lists of friends created by the account;

(l)  All records of Facebook searches performed by the from July 4, 2023, through November 16, 2023;

(m)  All information about the user's access and use of Facebook Marketplace;

(n)  The types of service utilized by the user;

(o)    The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)    All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)    All records pertaining to communications between Meta and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Meta is hereby ordered to disclose the above information to the government within 14 days of issuance of this warrant.

**II.      Information to be seized by the government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of Titles 21 U.S.C. §§ 841(a)(1) and 846 (possession of controlled substances with intent to distribute, distribution of controlled substances, and conspiracy to do the same) involving Cameron FULSTON and Bryan BULLARD since July 4, 2023, through November 16, 2023, including, for each user ID identified on Attachments A1-A2, information pertaining to the following matters:

(a)     Any information pertaining to the possession, sale, transportation and/or distribution of controlled substances or a conspiracy to do so within the United States. This includes communications with co-conspirators – both known and unknown – as to those criminal activities and preparatory steps taken in furtherance of the scheme.

(b)     Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime(s) under investigation and to the Facebook account owner;

(c)     The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## Affidavit In Support of Application for Search Warrant

I, Daniel Daugerdas, a Task Force Officer with the Drug Enforcement Administration ("DEA"), being duly sworn, hereby state as follows:

1.      As described further in Attachments A1-A2, this request is made to search the following Facebook User Accounts (referred to herein as the **"Target Accounts"**) for items that constitute evidence, fruits, and instrumentalities of violations of Titles 21 U.S.C. §§ 841(a)(1) and 846 (possession of controlled substances with intent to distribute, distribution of controlled substances, and conspiracy to do the same), as further described in Attachment B, for the period from July 4, 2023, through November 16, 2023:

   a. Facebook account "Cameron Fulston" with Facebook ID
      100093816679362 and URL
      facebook.com/profile.php?id=100093816679362
      ("**Target Account 1**")

   b. Facebook account "Bryan Bullard" with Facebook ID
      100000726734844 and URL facebook.com/crash01a
      ("**Target Account 2**")

### Introduction

2.      I make this affidavit in support of an application for a search warrant for information associated with certain Facebook accounts that are stored at premises owned, maintained, controlled or operations by Meta Platforms, Inc. ("Meta"), a company headquartered in Menlo Park, California. The information to be searched is described in the following paragraphs and in Attachments A1-A2. The affidavit is made in support of an application for a search warrant under 18 U.S.C. § 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Meta to disclose to the government records and other information in its possession, pertaining to the subscriber or customer associated with the accounts.

1

3.     I am presently employed by the San Diego District Attorney's Office as a District Attorney Investigator (DAI), Bureau of Investigation, and have been employed as a peace officer for over 16 years. I am currently a cross-sworn deputized federal Task Force Officer with the Drug Enforcement Administration (DEA), San Diego Field Division. I am currently assigned to the DEA's San Diego County Integrated Narcotics Task Force (NTF) Team 10, which is comprised of DEA Special Agents (SAs), Task Force Agents (TFAs) from Homeland Security Investigations (HSI), and other various Task Force Officers (TFOs). NTF Team 10 investigates illegal drug trafficking organizations (DTOs) operating within the United States and internationally, including those whose operations involve the distribution of wholesale quantities of illicit narcotics.  The focus of NTF Team 10 is the investigation of drug overdoses.

4.     Prior to my work with the District Attorney's Office and the DEA, I was a detective with the Port of San Diego Harbor Police Department and a cross-sworn federal Task Force Officer assigned to the Federal Bureau of Investigation's Major Traffickers Task Force and Cross Border Violence Task Force. With the FBI, I was a case agent on multiple Organized Crime Drug Enforcement Task Force (OCDETF) investigations, cases involving drug cartels, firearm sales and violent crime, including kidnappings and extortions, as well as working internationally with government law enforcement partners and sources on drug trafficking operations.

5.     Additionally, while employed as a Port of San Diego Harbor Police officer and detective, I took part in drug and human trafficking maritime interdiction operations, working with the United States Coast Guard, United States Border Patrol, and San Diego Sheriff's deputies.

6.     I have made thousands of contacts and/or arrests for violations involving controlled substances.  In the course of my employment, I have become familiar with the ordinary meaning of controlled substance slang and jargon, and I

2

am familiar with the manners and techniques of drug manufacturers and traffickers. I have become familiar with information about how criminals use phones to plan and carry out crimes, communicate with co-conspirators, dispose of evidence, and attempt to escape prosecution. I have participated in investigations involving undercover operations, use of confidential sources, and Title III wire intercepts. I have participated in many other aspects of criminal investigations including reviewing evidence, conducting physical surveillance, and executing search and arrest warrants. I have interviewed state and federal defendants and witnesses while conducting these various investigations. I have gained a working knowledge and insight into the normal operational habits of narcotics traffickers. In total, I have received over 250 hours of formal narcotic related training.

7. The facts in this affidavit come from my personal observations, my training and experience, and/or information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge regarding this investigation.

8. Based on my training and experience and the facts set forth in this affidavit, there is probable cause to believe that violations of Titles 21 U.S.C. §§ 841(a)(1) and 846 (possession of controlled substances with intent to distribute, distribution of controlled substances, and conspiracy to do the same) have been committed by Cameron FULSTON and Bryan BULLARD. There is probable cause to search the information described in Attachments A1-A2 for evidence of these crimes and contrabands or fruits of these crimes, as described in Attachment B.

**Facts in Support of Probable Cause**

9. On Sunday, September 10, 2023, at approximately 12:23 a.m., San Diego Police (SDPD) officers were dispatched for a suspected drug overdose to an apartment within a complex located at 8405 Rio San Diego Drive, San Diego,

California, within the Southern District of California. At 12:22 a.m., a 911 call had been placed by a then unknown male, during which he stated, "overdose, overdose," and that he was calling from "…her phone…" While the dispatcher was trying to explain life saving measures, the male stopped talking and the call ended.

10.     Upon arrival, officers met an individual identified as N.R. who directed them into his rented apartment where they located the 25-year-old female victim, D.G., laying unconscious on her back on the bathroom floor, her legs propped up on the bathtub, wearing pants, with no shirt, and a black brazier pulled upward.

11.     The first responding SDPD officer pulled D.G. from the bathroom, determined she was not breathing, and began CPR until medical personnel arrived. D.G. was later transported to Scripps Mercy Hospital in Hillcrest.

12.     While law enforcement was on scene, an individual identified as Cameron FULSTON arrived. FULSTON told police that he had received a Facebook call from a "buddy" of his, whom FULSTON referred to as "Bryan" or "Ryan," whom FULSTON had known for a couple of years. FULSTON stated that his "buddy" was no longer on scene. During the Facebook call to FULSTON, the "buddy" stated the girl they knew was not feeling well. FULSTON admitted to police that D.G. originally came to the apartment with him.

13.     Officers interviewed N.R., who was living at the apartment where the overdose took place. N.R. stated that he allowed a person he knows as "Bryan" over to his apartment to do laundry. N.R. stated that he was in the bedroom the whole time and did not see anything that had occurred in the rest of the apartment. N.R. said that he did not know FULSTON or D.G., and N.R. presumed that "Bryan" allowed them to come over. N.R. further stated that "Bryan" knocked on his door and advised him of someone being unresponsive. N.R. said that "Bryan" had called 911 then must have left the scene.

14.     Within the apartment, officers in plain view located a piece of foil with a brown liquid and a white chunk inside the bathroom where D.G. was found. Officers also located twelve and a-half (12.5) blue pills on the kitchen counter with M30 stamped on them. The foil and pills presumptively tested positive for the presence of fentanyl.

15.     On September 11th, 2023, Team 10 was notified of the incident and that family members were at Scripps Mercy Hospital with D.G. Investigators responded to the hospital where they learned from Intensive Care Unit medical personnel that D.G. was comatose, with no neurological responses and a low chance of survival. Medical personnel also stated that sexual intercourse may have recently occurred given they observed vaginal swelling and bruising on D.G.'s inner thighs. Finally, investigators learned that opiates were found in D.G.'s system.

16.     Five days after D.G.'s admittance to the hospital, on Friday, September 15, 2023, investigators were notified that she was still comatose and had no improvement. D.G. was removed from life-support that evening and pronounced deceased, with the San Diego County Medical Examiner's Office being notified.

17.     Team 10 conducted an investigation, which included the execution of multiple search warrants. Among the California state search warrants executed, included one for D.G.'s cellular phone, signed by San Diego County Superior Court Honorable Judge Frederick Maguire, (#2309121631-SDDA-FXM-SW), one for Facebook date records for D.G. and Cameron FULSTON's accounts, signed by San Diego Superior Court, Honorable Judge Jay Bloom (#2309181338-SDDA-JMB-SW), one for antemortem blood and urine collected from Scripps Mercy Hospital, signed by San Diego County Superior Court, Honorable Judge Patricia Cookson (#2310161530-SDDA-PKC-SW) and one for Facebook data records for suspect Bryan BULLARD, signed by San Diego County Superior Court, Honorable Judge Garry Haehnle (#2310111343-SDDA-AYM-SW).

18.     Investigators learned through presumptive testing of D.G.'s blood drawn upon her arrival at the hospital that it contained fentanyl, cocaine, benzodiazepines, and ethanol. Subsequent testing of D.G.'s antemortem blood by the San Diego County Medical Examiner's Office confirmed 0.73 ng/ML of fentanyl, 0.20 ng/mL of 4-ANPP (a chemical precursor of fentanyl), and 0.53 mg/L of benzoylecgonine.  The  cause  of  death  was  listed  as  anoxic-ischemic encephalopathy due to resuscitated cardiopulmonary arrest, with contributing factors of fentanyl, benzodiazepine, cocaine, and alcohol intoxication.

19.     Investigators met separately with N.G.'s live-in boyfriend of two years, N.S., as well as her mother, C.A-G., and sister T.G. C.A-G. provided investigators with N.G.'s cellular phone, while N.S. provided the phone's passcode. T.G. and C.A-G. also provided a handwritten note that was located inside N.G.'s purse. N.S., C.A-G., and T.G. all related similar accounts in which they described how on Saturday, September 9, 2023, N.S. and D.G. got into an argument. D.G. left her residence in Carlsbad, taking a ride-share taxi to an unknown location. N.S. showed investigators text messages from his phone to D.G.'s phone, asking whom she was with. The messages went unanswered.

20.     C.A-G. repeatedly tried contacting D.G. into the following day with no response. After not returning on Sunday, N.S. began utilizing D.G.'s home computer which was connected to social media applications, including Facebook. N.S. and the family messaged the username of "Cameron Fulston" on Facebook Messenger (**Target Account 1**). The user of **Target Account 1** responded, and described how he (FULSTON) and D.G. were friends and that she came to another friend's apartment in San Diego. He described how D.G. was there for about an hour then FULSTON left to get good. FULSTON told the family through continued messages that he thought D.G. smoked some opiates, likely fentanyl, and started having problems breathing. CPR was administered (unknown by whom) then someone

6

called 911. FULSTON wrote that he felt bad and tried doing the right thing by going to the hospital and dropping off her belongings. FULSTON provided the family with the address to Scripps Mercy Hospital.

21.   T.G. showed investigators her own Facebook account, showing a Facebook message she had received from **Target Account 1** back on July 4, 2023. The message read, "hey whats going on , you still working a carlsbad bar." T.G. did not answer the message, and stated that many people know her and where she works.

22.   In reviewing D.G.'s phone, investigators confirmed it belonged to D.G. based on the Settings application with the Apple ID bearing her name and photograph. Investigators also observed D.G.'s Facebook and Instagram accounts within the phone, and the Facebook Messenger conversation she had with **Target Account 1**. **Target Account 1** displayed a profile picture that matched that of Cameron FULSTON's Department of Motor Vehicle identification photograph, as well as prior booking photographs of FULSTON.

23.   Through the Facebook Messenger conversation between D.G.'s and **Target Account 1**, investigators learned that earlier on Saturday, September 9th, FULSTON messaged D.G. and asked if she used drugs. D.G. stated that she does "Downers mostly." FULSTON described currently smoking with his source of supply, and that the source mostly had methamphetamine and fentanyl. D.G. asked for FULSTON to pick her up because she wanted to use drugs. FULSTON clarified that he was, "…not smoking it now trying to stay away but I'll hook u up." D.G. agreed to get a Lyft to come meet with FULSTON but she wanted to confirm, "Do you have the fetty[1] though," to which FULSTON responded, "Yeah". FULSTON provided the address of 8405 Rio San Diego Dr. in San Diego, and D.G. provided continued updates as to how far she was away.  FULSTON went on to say that if

---

[1] "Fetty" refers to fentanyl.

D.G. did not want to provide money for the "fetti," for her to "…just play around with my boi like don't need to fuck him or anything just show him some attention like be chill vibe with him talk to him a bit he'll hook it up…"

24.   As D.G. got closer in distance, FULSTON described himself in text messages to D.G. that he was wearing a white t-shirt and tan pants, then added that he had "…some fetti & foil…" After some time passed, FULSTON messaged that he was out front now wearing a "black sweatshirt."[2]

25.   Through additional messages, seemingly after D.G. had arrived and met FULSTON, FULSTON then later messaged D.G. saying, "That's kinda grimy a bit like are you just feeling him like that more or what," and "I'm not trying to get jealous, but your fucking hot so ima feel some type of way if you just hook up with Bryan," then "You down for a 3sum". From reviewing D.G.'s account, those messages appeared to go unanswered, with a follow-up missed Facebook Audio Call from FULSTON to D.G. at 12:21 AM.

26.   In review of publicly available Facebook information of **Target Account 1**, investigators observed FULSTON to be Facebook friends with account username "Bryan Bullard" (**Target Account 2**). The Facebook profile picture of **Target Account 2** matched that of BULLARD's California DMV's identification photograph, as well as prior booking photographs of BULLARD. BULLARD at that time, was wanted on an outstanding arrest warrant.

27.   Through hospital personnel, investigators learned that during the day on Sunday, September 10th, an individual did in fact drop off belongings for D.G. while she was admitted at Scripps Hospital. Within D.G.'s purse was the located handwritten note which stated how the person was dropping off her personal belongings and that they had already contacted her sister. The note also said to call

---

[2] Investigators later learned that FULSTON was wearing a black sweatshirt when contacted by SDPD officers following D.G.'s overdose.

if she needed a ride when she got discharged, and provided a phone number of XXX-XXX-4375.

28.     Through law enforcement databases, investigators confirmed the phone number ending in -4375 belonged to FULSTON, as FULSTON had provided the number during a past criminal investigation. Also, upon later review of camera footage at Scripps Mercy Hospital, investigators positively identified FULSTON who had arrived at the emergency room at approximately 11:45 a.m. on Sunday, September 10, 2023.

29. On October 10, 2023, investigators obtained apartment complex video surveillance footage from the dates and times leading up to and including D.G.'s suspected overdose at 8405 Rio San Diego Drive, San Diego, California. In reviewing the surveillance video from September 9, 2023, at 7:34 p.m., two individuals matching the description of FULSTON and BULLARD, entered the 8405 Rio San Diego Drive building. At 9:33 p.m., the surveillance video showed FULSTON and D.G. appearing to meet and then both entering the apartment building. The surveillance video proceeded to show the incident unfold, which included police responding to the scene at approximately 12:26 p.m. and paramedics responding to the scene at approximately 12:30 p.m.

30.     The video surveillance showed at 1:53 a.m. on September 10th, BULLARD again appeared and walked up to the building's call-box. A separate still photograph was taken of BULLARD from the call box allowing law enforcement to positively identify BULLARD. BULLARD then entered the building. At 2:34 a.m., FULSTON and BULLARD were seen exiting the building and walking out of frame.

31.     On October 11, 2023, investigators received notice from San Diego Sheriff's deputies that FULSTON was taken into custody on an unrelated case. FULSTON was subsequently transported to the San Diego Sheriff's Station in Vista, California. Investigators responded to the Vista Patrol Station and met with

FULSTON in an interview room. FULSTON was read his *Miranda* rights from a pre-printed card. Through the limited interaction, it was highly suspected that FULSTON was under the influence of a controlled substance and unable to answer simple questions. It was also clear that FULSTON did not understand what investigators were saying and the interview was ended.

32.    On November 1, 2023, investigators obtained a search warrant for continuous GPS location pings for BULLARD's cellular phone, signed by San Diego County Superior Court Honorable Judge Jay Bloom, (#2311011533-SDDA-DFL-SW). In review of GPS location data for BULLARD's cellular phone, investigators located a specific apartment in San Diego.

33.    Investigators were familiar with this building and specific apartment, it being inside the same apartment complex where victim D.G. overdosed. Investigators learned that the renter of the apartment was on probation for firearms offenses, and also, had an active fourth-amendment waiver issued in San Diego County Superior Court.

34.    On November 14, 2023, during surveillance of the apartment, investigators observed as BULLARD exited then re-entered the apartment. Two days later, on the morning of November 16, 2023, law enforcement subsequently planned a probation search at the apartment. During pre-surveillance of the apartment, law enforcement observed BULLARD exit the apartment and enter the elevator, going downstairs to the building's garage. Simultaneously, other law enforcement personnel approached the building and observed BULLARD exit the elevator and enter the garage where he was taken into custody on the outstanding arrest warrant. In BULLARD's hands was a cellular phone which was later confirmed to be the same one for which investigators had the active GPS location ping.

35.     Law enforcement performed the probation search at the apartment, detaining two individuals inside. During a search of the common areas of the apartment, investigators located a red Milwaukee canvas bag containing multiple clear plastic baggies with sales quantities of crystalline materials and white powdery and rock-like substances. Additionally, inside the canvas bag, was a wallet containing the California identification card of "Bryan Kim Bullard," and $360 in cash. Based on my training and experience, the cash was indicative of street-level sales of narcotics, being in various denominations, specifically 11-$20 bills, 3-$10 bills, 17-$5 bills, and 25-$1 bills.

36.     The white powdery substance weighted approximately 30 grams and tested presumptively positive for the presence of fentanyl. The crystalline material weighed approximately 20 grams and presumptively tested positive for the presence of methamphetamine.

37.     While detained, but not in handcuffs, investigators asked one of the two detained individuals for consent to search her cellular phone, which was seen in plain view in the apartment's kitchen. The individual agreed, provided the passcode for the phone, and signed a consent to search form. Within the phone, investigators located a video, dated October 13, 2023, at 3:34 a.m., showing BULLARD hunched over in a chair, appearing to be on the apartment's balcony. In the video, BULLARD has a yellow torch lighter in his hands, and a red Milwaukee canvas bag on the ground at his feet.

38.     On November 30, 2023, a three-count Complaint was filed against BULLARD and FULSTON in 23-MJ-4328, for violations of Title 21, United States Code, Sections 841(a)(1) and 846 (conspiracy to distribute fentanyl), 841(a)(1) and Title 18, United States Code, Section 2 (distribution of fentanyl and aiding and abetting), and against BULLARD only for Count 3, a violation of Title 21, United States Code, Section 841(a)(1) (possession with intent to distribute). On February 6,

2024, BULLARD and FULSTON were arraigned on the Information charging the same three counts, and both BULLARD and FULSTON are currently detained. The next date is a Motion/Hearing Trial Setting set for May 6, 2024, in 24-CR-201-BAS.

39.     Based on the above information, I believe FULSTON and BULLARD utilized the **Target Accounts** leading up to and during the distribution of a controlled substances which led to the death of GOOD. The **Target Accounts**, based on FULSTON's own admission, appear to be a primary means of communication between the two suspects and I believe the acquisition of the digital evidence, as described in Attachment B, would yield evidence of violations listed above. For example, as noted in Paragraph 12, FULSTON admits to utilizing **Target Account 1** as a means of communication. FULSTON specifically stated that he received a Facebook call from his "buddy," later determined to be BULLARD, that the girl that he had brought to the apartment was not feeling well.

40.     Given the facts of this affidavit, my understanding of how social-media accounts can be used in furtherance of the offenses as described herein, and my awareness that social media accounts can retain information for extended periods of time, I submit that this Court should authorize a search of the **Target Accounts** for the period of July 4, 2023, up to and including November 16, 2023. Based on my training and experience, I am aware that conspiracies to distribute controlled substances can last weeks, months, and even years. Based on the investigation, FULSTON is known to be an active Facebook user in this case, dating back to at least July 4, 2023, when he messaged D.G.'s sister. As to the end date, on November 16, 2023, BULLARD was arrested with fentanyl and methamphetamine, and indicia of drug sales.

41.     Meta owns and operates Facebook, a free-access social networking website that can be accessed at http://www.facebook.com.  Facebook users can use

their accounts to share communications, news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

42.     Meta asks Facebook users to provide basic contact and personal identifying information either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Each Facebook user is assigned a user identification number and can choose a username.

43.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network. Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

44.     Facebook users can select different levels of privacy for the communications and information associated with their Facebook accounts.  By adjusting these privacy settings, a Facebook user can make information available only to himself or herself, to particular Facebook users, or to anyone with access to the Internet, including people who are not Facebook users.  A Facebook user can also create "lists" of Facebook friends to facilitate the application of these privacy settings.  Facebook accounts also include other account settings that users can adjust to control, for example, the types of notifications they receive from Facebook.

45.     Facebook users can create profiles that include photographs, lists of personal interests, and other information.  Facebook users can also post "status" updates about their whereabouts and actions, as well as links to videos, photographs, articles, and other items available elsewhere on the Internet.  Facebook users can also post information about upcoming "events," such as social occasions, by listing the event's time, location, host, and guest list.  In addition, Facebook users can "check in" to particular locations or add their geographic locations to their Facebook posts, thereby revealing their geographic locations at particular dates and times.  A particular user's profile page also includes a "Wall," which is a space where the user and his or her "Friends" can post messages, attachments, and links that will typically be visible to anyone who can view the user's profile.

46.     Facebook users can upload photos and videos to be posted on their Wall, included in chats, or for other purposes.  Users can "tag" other users in a photo or video and can be tagged by others.  When a user is tagged in a photo or video, he or she generally receives a notification of the tag and a link to see the photo or video.

47.     Facebook users can use Facebook Messenger to communicate with other users via text, voice, video.  Meta retains instant messages and certain other shared Messenger content unless deleted by the user, and also retains transactional records related to voice and video chats. of the date of each call.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.

48.     If a Facebook user does not want to interact with another user on Facebook, the first user can "block" the second user from seeing his or her account.

49.     Facebook has a "like" feature that allows users to give positive feedback or connect to particular pages.  Facebook users can "like" Facebook posts

or updates, as well as webpages or content on third-party (*i.e.*, non-Facebook) websites.  Facebook users can also become "fans" of particular Facebook pages.

50.    Facebook has a search function that enables its users to search Facebook for keywords, usernames, or pages, among other things.

51.    Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present. The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

52.    Facebook also has a Marketplace feature, which allows users to post free classified ads.  Users can post items for sale, housing, jobs, and other items on the Marketplace.

53.    In addition to the applications described above, Meta provides users with access to thousands of other applications ("apps") on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

54.    Meta also retains records of which IP addresses were used by an account to log into or out of Facebook, as well as IP address used to take certain actions on the platform.  For example, when a user uploads a photo, the user's IP address is retained by Meta along with a timestamp.

55.    Meta retains location information associated with Facebook users under some circumstances, such as if a user enables "Location History," "checks-in" to an event, or tags a post with a location.

56.    Social networking providers like Meta typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source

15

of any payments associated with the service (including any credit card or bank account number). In some cases, Facebook users may communicate directly with Meta about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users. Social networking providers like Meta typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

57. As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Meta, can indicate who has used or controlled the Facebook account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time. Further, Facebook account activity can show how and when the account was accessed or used. For example, as described herein, Meta logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date. By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation. Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation. Additionally, location information retained by Meta may tend to either inculpate or

exculpate the Facebook account owner. Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation. For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

58. Therefore, the servers of Meta are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## PRIOR ATTEMPTS TO OBTAIN THIS EVIDENCE

59. As noted previously, on September 18, 2023, law enforcement obtained records from Meta for FULSTON's Facebook account signed by San Diego Superior Court Judge Jay Bloom (#2309181338-SDDA-JMB-SW). On October 11, 2023, law enforcement obtained records from Meta for BULLARD's Facebook account signed by San Diego Superior Court Judge Garry Haehnle (#2310111343-SDDA-AYM-SW). With respect to the instant affidavit, however, I have not included any information found in those Meta returns as probable cause for this affidavit.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

60. I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Meta to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized

persons will review that information to locate the items described in Section II of Attachment B.

/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /
/ /

1

## **CONCLUSION**

2
    61.    Based on the foregoing, I request that the Court issue the proposed

3
search warrant.

4
    62.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement

5
officer is not required for the service or execution of this warrant. The government

6
will execute this warrant by serving it on Meta. Because the warrant will be served

7
on Meta, who will then compile the requested records at a time convenient to it,

8
reasonable cause exists to permit the execution of the requested warrant at any time

9
in the day or night.

10
    63.    This Court has jurisdiction to issue the requested warrant because it is

11
"a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§

12
2703(a), (b)(1)(A) & (c)(1)(A). Specifically, the Court is "a district court of the

13
United States . . . that – has jurisdiction over the offense being investigated." 18

14
U.S.C. § 2711(3)(A)(i).

15
    64.    Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement

16
officer is not required for the service or execution of this warrant.

17

18
Daniel
Daugerdas

Digitally signed by Daniel
Daugerdas
Date: 2024.03.13 12:27:59
-07'00'

19
_____
Daniel Daugerdas
DEA Task Force Officer

20

21
Sworn and attested to under oath by telephone, in accordance with Federal Rule of

22
Criminal Procedure 4.1 on March 13, 2024.

23

24
_____

25
HON. BERNARD G. SKOMAL
United States Magistrate Judge

26

27